**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

GREE, INC.,

               *Plaintiff,*

       v.

SUPERCELL OY,

              *Defendant.*

Case No. 2:19-cv-00310-JRG-RSP
Case No. 2:19-cv-00311-JRG-RSP

## <u>CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER</u>

This Order addresses the claim-construction disputes presented by the parties in Case No. 2:19-cv-00310-JRG-RSP (the "'310 Case") and Case No. 2:19-cv-00311-JRG-RSP (the "'311 Case"). Before the Court are the opening claim construction briefs of GREE, Inc. ("Plaintiff") ('310 Case Dkt. No. 63 and '311 Case Dkt. No. 62, both filed on July 24, 2020), the responses of Supercell Oy ("Defendant") ('310 Case Dkt. No. 65 and '311 Case Dkt. No. 64,[1] both filed on August 10, 2020), and Plaintiff's replies ('310 Case Dkt. No. 68 and '311 Case Dkt. No. 68,[1] both filed on August 17, 2020). The Court held a hearing on the issues of claim construction and claim definiteness on September 1, 2020. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] '311 Case Dkt. Nos. 64 and 68 were both filed under seal. Redacted versions were filed as Dkt. Nos. 67 and 69, respectively.

## Table of Contents

I.    BACKGROUND ................................................................................................ **4**

    A.    The '708 and '832 Patents ............................................................ 4

    B.    The '107 and '439 Patents ............................................................ 5

II.    LEGAL PRINCIPLES ....................................................................................... **7**

    A.    Claim Construction ..................................................................... 7

    B.    Departing from the Ordinary Meaning of a Claim Term ..................... 10

    C.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ............. 11

III.    AGREED CONSTRUCTIONS ....................................................................... **12**

IV.    CONSTRUCTION OF DISPUTED TERMS ................................................. **12**

    A.    Case No. 2:19-cv-310 ............................................................... 12

        A-1.    "selected randomly" ................................................ 12

        A-2.    "character" and "and at least one of the cells including a character …" .............. 16

        A-3.    "displaying, during the virtual game, an item associated with the selected cell, which is determined by the server based on the selection request" ............ 19

        A-4.    "wherein each of a plurality of items extracted from an item information table pertaining to a user is associated with each of the plurality of the cells" ............ 22

        A-5.    The Associated-Memory Terms ................................ 24

        A-6.    "[sending information to a user terminal for displaying, in a virtual game,] a sheet comprising the plurality of cells and obtainable item information" and "[send information to a user terminal for displaying, in a virtual game,] a sheet comprising the plurality of cells and obtainable item information" ............ 26

        A-7.    "send[ing] information for differentiating, in the virtual game, a display of the one cell from another cell of the plurality of cells in the sheet, wherein the differentiating of the display of the one cell is done in response to the selection request to select the one cell" .......... 28

        A-8.    "providing" and "provide" ...................................... 32

    B.    Case No. 2:19-cv-311 ............................................................... 34

        B-1.    "game pieces" ....................................................... 34

        B-2.    "game item" ......................................................... 38

        B-3.    The Skill-Level Terms ............................................ 42

        B-4.    The Allocation-Information Terms ............................. 48

        B-5.    The Parameter-Value Terms .................................... 51

        B-6.    "cooperatively participate in the game" ...................... 56

B-7.   "periodically causing an event to occur for providing one of the plurality of game pieces to a user"............................................................ 57

B-8.   "ranking point"......................................................................................... 60

**V.    CONCLUSION .................................................................................................. 62**

## I.     BACKGROUND

In the two cases addressed in this Order, Plaintiff alleges infringement of four U.S. Patents. In the '310 Case, Plaintiff asserts two U.S. Patents: No. 10,076,708 (the "'708 Patent") and No. 10,413,832 (the "'832 Patent"). In the '311 Case, Plaintiff asserts two U.S. Patents: No. 9,079,107 (the "'107 Patent") and No. 9,561,439 (the "'439 Patent"). The '107, '439, '708, and '832 Patents are collectively referred to herein as the "Asserted Patents."

### A.     The '708 and '832 Patents

The '708 and '832 Patents are related. As stated on the face of the patents, the application that issued as the '832 Patent is a continuation of the '708 Patent's application and both patents ultimately claim priority to a Japanese application filed June 21, 2012.

The patents are generally directed to a computer-game control method, server, and program "that can increase the variations on methods for acquiring battle cards and the like, increase the predictability of acquisition of a card or the like with a high rarity value or the like, and heighten interest in the game." '708 Patent col.1 ll.47–53. The two patents have the same abstract, which provides:

> A game control method, game server, and program can increase variations on methods for acquiring items, increase the predictability of acquisition of an item with a high rarity value or the like, and heighten interest in the game. Included are the steps of presenting a communication terminal, connected over a communication line, with acquirable item information that, for each item type, includes a total count and an acquisition count or a non-acquisition count of items when receiving, from the communication terminal, a request to present information related to items acquirable by the communication terminal, determining an item to provide to the communication terminal when receiving an item acquisition request from the communication terminal, and changing the acquirable item information when receiving a reset request from the communication terminal.

Claim 1 of the '708 Patent and Claim 4 of the '832 Patent, exemplary method and system claims respectively, recite as follows (with terms in dispute in bold italics and those Defendant contends render claims indefinite underlined):

**'708 Patent Claim 1.** A game control method comprising the steps of:

(a) initializing a virtual game;

(b) displaying, during the virtual game, a plurality of cells and acquirable item information that is received from a server over a communication line, the plurality of cells being displayed in the same size, ***wherein each of a plurality of items extracted from an item information table pertaining to a user is associated with each of the plurality of cells***, the plurality of items being ***selected randomly*** only from items in the item information table, ***and at least one of the cells including a character which indicates a rarity value of an item associated with the at least one of the cells***;

(c) receiving, during the virtual game, a selection request selecting one of the plurality of cells and sending the selection request to the server; and

(d) ***displaying, during the virtual game, an item associated with the selected cell, which is determined by the server based on the selection request***.

**'832 Patent Claim 4**. A game server comprising:

<u>***a memory in which each of a plurality of cells is associated with each of extracted items extracted from the memory***</u>; and

a controller configured to

> ***send information to a user terminal for displaying, in a virtual game, a sheet comprising the plurality of cells and obtainable item information***, the obtainable item information comprising at least one of (i) a total number of items for each item type, (ii) a number of obtained items and (iii) a number of un-obtained items,
>
> receive, in the virtual game, a selection request from the user terminal to select one cell among the plurality of cells,
>
> ***send information for differentiating, in the virtual game, a display of the one cell from another cell of the plurality of cells in the sheet, wherein the differentiating of the display of the one cell is done in response to the selection request to select the one cell***, and
>
> ***provide***, in the virtual game, an item of the extracted items that is associated with the one cell to a user of the user terminal.

## B.     The '107 and '439 Patents

The '107 and '439 Patents are related. As stated on the face of the patents, the application that issued as the '439 Patent is a division of the '107 Patent's application and both patents ultimately claim priority to a Japanese application filed March 12, 2013.

The patents are generally directed to a computer-game control method, server, and program "in which a plurality of users plays in cooperation with one another." '107 Patent col.2 ll.26–29. The two patents have the same abstract, which provides:

Provided is a game control method carried out by a game control device connected to communication terminals used by users who play a game. The device has a storage unit for storing group information indicative of a group consisting of users and game piece information indicative of game pieces constituting one item. The method includes giving a game piece to each user in accordance with a user operation to his/her communication terminal; storing obtained game piece information indicative of the game piece given to each user in the storage unit; determining whether all of the game pieces necessary to constitute the one item indicated by the game piece information are given to users constituting a group indicated by the group information based on the obtained game piece information; and giving a reward to users constituting the group if it is determined that all of the game pieces are given.

Claim 1 of the '107 Patent and Claim 7 of the '439 Patent, exemplary method and *Beauregard*

claims respectively, recite as follows (with terms in dispute emphasized):

**'107 Patent Claim 1**. A game control method carried out by a game control device for providing a game to a plurality of communication terminals respectively used by a plurality of users, the game control device communicating with the plurality of communication terminals and having a storage unit, the method comprising the steps of:
   (a) storing *skill level information* indicative of skill levels of each of the plurality of users of the game, in the storage unit;
   (b) grouping the plurality of users into one or more groups;
   (c) *providing one or more of a plurality of game pieces to a first plurality of users in a first group of said one or more groups, based on the skill level information, while the first plurality of users are at certain events in the game*;
   (d) storing *allocation information indicating which game piece has been provided to which user* with a respective skill level, and a number and type of game pieces required to obtain a *game item* as a reward, in the storage unit;
   (e) *determining whether all of the game pieces required to obtain said game item have been provided to the first group, based on the allocation information stored in the storage unit*; and
   (f) allocating in a memory, the game item to the first group or at least one of the first plurality of users, when it is determined that all the required game pieces have been provided.

**'439 Patent Claim 7**. A non-transitory computer readable recording medium for storing a program that causes a processor of a game control device to execute a process, the game control device providing a game to a plurality of communication terminals respectively used by a plurality of users over a communication network, and having a storage unit, the process comprising the steps of:
   (a) grouping the plurality of users into one or more groups;

6

(b) storing a correspondence between the plurality of users and the one or more groups in the storage unit;

(c) transmitting information over the communication network to initiate a group event in which a first plurality of users forming a first group *cooperatively participate in the game*;

(d) *storing a parameter value for each of the plurality of users, wherein the parameter value for a respective user is increased as the respective user makes progress in the group event*;

(e) monitoring progress of the group event and *updating the parameter value for each of the first plurality of users in accordance with the progress of the first group in the group event*;

(f) providing at least one of a plurality of *game pieces* to each of the first plurality of users in the group event, based on the parameter value for the corresponding user, wherein the plurality of game pieces are required to obtain a *game item*;

(g) storing *allocation information indicating which game piece has been provided to which user*, in the storage unit;

(h) *determining whether all the required game pieces have been provided to the first plurality of users, based on the allocation information*; and

(i) allocating in a memory, the game item to the first group or at least one of the first plurality of users, when it is determined that all the required game pieces have been provided within a predetermined period of time during which the group event is taking place.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of

7

ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or

disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court

understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.   Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed.

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## C.     Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to

comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III.   AGREED CONSTRUCTIONS

The parties have agreed to constructions set forth in their Joint Claim Construction Charts ('310 Case Dkt. No. 69; '311 Case Dkt. No. 70). Based on the parties' agreement, the Court hereby adopts the agreed constructions for these cases.

## IV.   CONSTRUCTION OF DISPUTED TERMS

### A.   Case No. 2:19-cv-310

#### A-1.   "selected randomly"

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "selected randomly"<br><br>• '708 Patent Claims 1, 2, 3 | plain and ordinary meaning; no construction needed | selected without preference to any particular item such that each item has an equal probability of being selected |

---

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims

**The Parties' Positions**

Plaintiff submits: The meaning of the term "selected randomly" is plain without construction. Defendant's proposed construction improperly limits the term by injecting "selected without preference" and "equal probability of being selected" limitations. Properly understood, "selected randomly" encompasses selecting items from a table according to probabilities weighted in favor of some items over others, such as when a particular item appears more often in the table. '310 Case Dkt. No. 63 at 7–9.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '708 Patent col.4 ll.10–14, col.4 ll.24–26, col.4 ll.38–40, col.5 ll.1–2, col.5 ll.44–47.

Defendant responds: Under its plain meaning, "selected randomly" in the claims requires that the items are selected from among unique items in the item information table without preference for any item in the table. That is, each unique item in the table has the same probability of being selected, though there may be more than one item of a particular item type. The "suggestion that the plain and ordinary meaning of 'randomly selected' encompasses 'weighted' probabilities is absurd." '310 Case Dkt. No. 65 at 7–10.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '708 Patent figs.2A, 9, col.4 ll.11–16, col.4 ll.24–32, col.4 ll.40–43.

Plaintiff replies: The claims expressly require that the items be selected from an item information table, but do not require that each item in the information table appear only once in the table. Thus, while each table entry may have the same probability of selection, a particular item

---

identified in the parties' Joint Claim Construction Charts ('310 Case Dkt. No. 69, '311 Case Dkt. No. 70) are listed.

may be found in more than one entry of the table and thus have a higher probability of selection than an item that appears less frequently in the table. '310 Case Dkt. No. 68 at 1–2.

Plaintiff cites further **intrinsic evidence** to support its position: '708 Patent fig.2A, col.4 ll.14–16.

### Analysis

The issues in dispute distill to whether the requirement that items are "selected randomly" from a table necessarily entails that each item have the same probability of selection. It does not.

The Court is not persuaded that "selected randomly" requires equal selection probability for every potential item. As relevant here, the claims are directed to selecting acquirable items from a table "randomly." For instance, '708 Patent Claim 1 recites: "displaying, during the virtual game, a plurality of cells and acquirable item information . . . the plurality of items extracted from an item information . . ., the plurality of items being selected randomly only from items in the item information table." '708 Patent col.14 ll.1–5. As described in the patent, different items have different "rarity values." *See, e.g.*, '708 Patent col.3 l.53 – col.4 l.16 ("The item type is a numerical value representing the rarity value of the item"), col.7 ll.47–55 (describing "an item with a high rarity value or the like"). Items with

'708 Patent, fig.2A

| Item identification information | Item name | Item type |
|---|---|---|
| UN11 | Item A | 3 |
| UN12 | Item B | 1 |
| UN13 | Item C | 2 |
| UN14 | Item D | 5 |
| UN15 | Item E | 1 |
| UN16 | Item F | 1 |
| UN17 | Item G | 1 |
| UN18 | Item H | 3 |
| UN19 | Item I | 4 |
| UN110 | Item J | 2 |
| UN111 | Item K | 2 |
| UN112 | Item K | 2 |
| UN113 | Item K | 2 |
| UN114 | Item L | 1 |
| UN115 | Item M | 1 |
| UN116 | Item M | 1 |
| UN117 | Item N | 4 |
| UN118 | Item O | 2 |
| UN119 | Item P | 1 |
| UN120 | Item Q | 1 |
| UN121 | Item M | 3 |
| UN122 | Item M | 3 |
| UN123 | Item N | 5 |
| UN124 | Item O | 2 |
| UN125 | Item P | 1 |
| UN126 | Item Q | 1 |
| UN127 | Item R | 5 |
| UN128 | Item S | 2 |
| UN129 | Item T | 1 |
| UN130 | Item U | 1 |

higher rarity values are less likely to be found than those with lower rarity values. *See, e.g., id*. at col.1 ll.43–44 ("it is difficult to acquire a battle card or the like with a high rarity value"). This suggests that the probability of acquiring an item varies with an item's "rarity value."

The described embodiments also suggest the probability of acquiring an item may vary from item to item. For instance, in the table depicted in Figure 2A, reproduced here and annotated by the Court, Item K appears three times in the table whereas Item A appears only once in the table. If each table entry is as likely as another, the probability of randomly selecting Item K from the table is three times that of selecting Item A. There is a preference for Item K.

The Court is not convinced that the item selection of the claims necessarily is restricted to a particular instance of an item, as Defendant suggests. '310 Case Dkt. No. 65 at 10. It is true that items may be uniquely identified. For instance, Figure 2A lists unique "Item Identification Information" for each instance of an item. '708 Patent col.4 ll.30–32. But there are three instances of Item K in the figure, suggesting that "item" does not necessarily refer to an instance of an item. And as set forth above, the patent describes a "rarity value" of an item. Again, this suggests that "item" does not necessarily refer to a "unique" item, else all items would be equally rare. Ultimately, even if "item" in the claim refers to unique instances of items with a common name, the patent teaches that the items are randomly selected from a table, but with a preference for items that have not already been provided to the user. *See, e.g., id*. at col.5 ll.43–46 ("the control unit 13 refers to one of the item information tables 111a to 111c, randomly selects an item not included in the identification information of provided items"). In other words, the patent expressly teaches selecting "randomly" from among items in a table but weighing the probability of selection of some items differently than others.

Finally, Defendant has not presented any evidence that "randomly" has a customary meaning in the art other than "by chance" or the like that would require random selections to be selections from among items each having an identical probability of selection. Ultimately, the Court understands that "selected randomly" indicates selecting something in a non-certain, non-deterministic manner, but does not require that all potential selections have the same probability of selection. Thus "randomly" is not restricted to selecting among equal-probability items without preference for any item over any other item.

Accordingly, the Court rejects Defendant's proposed construction and construes "selected randomly" as follows:

- "selected randomly" means "selected by chance."

**A-2.   "character" and "and at least one of the cells including a character …"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "character"<br><br>- '708 Patent Claim 1, 2, 3<br>- '832 Patent Claims 3, 6, 14 | attribute | a symbol, which is distinct from an item |
| "and at least one of the cells including a character which indicates a rarity value of an item associated with the at least one of the cells"<br><br>- '708 Patent Claims 1, 2, 3 | See construction of "character." Otherwise, plain and ordinary meaning; no construction needed. | and at least one of the cells including a symbol, which is distinct from the item, which indicates a rarity value of an item associated with at least one of the cells |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: As used in the claims, the word "character" expressly indicates a rarity value of an item and thus "character" is used to denote an attribute of the item. This does not require that

16

the "character" is distinct from the item. For example, the '708 Patent discloses an embodiment in which rarity is indicated by patterns in the cells of the item information table. '310 Case Dkt. No. 63 at 9–10, 13.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '708 Patent fig.8, col.4 ll.14–16, col.9 ll.63–67, col.11 l.61–63.

Defendant responds: As expressed in the claims, the "character" that indicates the rarity of the item is more than the item itself. Notably, the '708 Patent distinguishes item-table cell attributes such as patterns and colors from symbols that may be displayed in a cell, such as icons and characters. This distinction was reinforced during prosecution of the '708 Patent. Specifically, the applicant amended the claims to include the "character" limitation and explained that a "character" is distinct from a pattern. '310 Case Dkt. No. 65 at 10–12, 17.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '708 Patent col.4 ll.14–16, col.9 ll.64–67, col.12 ll.15–19; '708 Patent File Wrapper April 26, 2018 Amendment at 2–4 (Defendant's Ex. B, Dkt. No. 65-3 at 3–5).

Plaintiff replies: In the patent and the prosecution history, while "character" is enumerated separately from "pattern," the two terms are not thereby rendered mutually exclusive. In other words, the plain meaning of "character" is broad enough to encompass patterns and colors and thus should be construed as "attribute." '310 Case Dkt. No. 68 at 2–4, 6.

Plaintiff cites further **intrinsic evidence** to support its position: '708 Patent fig.9, col.11 ll.61–63, col.12 ll.15–19, col.12 ll.64–67.

### Analysis

The issues in dispute appear to distill to: (1) whether a "character" in a cell that is used to denote the rarity of an item encompasses any attribute; and (2) whether the "character" is

17

necessarily distinct from the item. The "character" is not simply any attribute and it is necessarily distinguishable from the item itself.

In the appropriate context, "character" in the '708 and '432 Patents denotes a computer character that is one of several distinct forms used to denote rarity. For example, the patents provide "character" as an alternative to "patterns" and "colors" to denote the rarity of an item. Specifically, the patents provide that "[t]he item type is a numerical value representing the rarity value of the item." '708 Patent col.4 ll.14–16. The patents further describe:

> FIG. 7(a) illustrates an example of acquirable item information presented by the information presentation unit 12 in Embodiment 2. … Items are associated with the boxes 201 to 219 so that the respective counts of necessary acquisition attempts are 1 to 19. Each box is displayed with a pattern that differs in accordance with the item type of the corresponding item.
>
> As illustrated in the example in FIG. 7(a), when the numerical value of the item type is at least a predetermined value, the pattern shown in box 204 and the like is displayed. …
>
> The **patterns** for displaying the boxes 201 to 219 are **not limited** to these examples. The boxes 201 to 219 **may be painted a predetermined color** in accordance with the item type, or a **predetermined icon, character, or the like** may be displayed in the boxes 201 to 219.

'708 Patent col.9 ll.16–67 (emphasis added). This distinction between "pattern" and "character" was reemphasized during prosecution, where the applicant explained:

> The claims are further amended to recite the feature of "at least one of the cells including a character which indicates a rarity value of an item associated with the at least one of the cells." This feature may be understood with reference to the publication of this application, with paragraph [0089] disclosing that each cell may have a **"character" in lieu of the "pattern"** in accordance with the "item type" as in paragraph [0087], and paragraph [0040] describing the "item type" as representing the rarity value."

'708 Patent File Wrapper April 26, 2018 Amendment at 4, Dkt. No. 65-3 at 5. Ultimately, "character" is used to denote an attribute of the item, the "rarity value." It is not itself simply an

attribute. On balance, the term "symbol" adequately captures the distinction between "character" and the other forms described in the patent for denoting the rarity attribute of an item.

Accordingly, the Court determines that there is no need to construe "and at least one of the cells including a character . . . cells" apart from "character" and construes "character" as follows:

- "character" means "symbol."

### A-3. "displaying, during the virtual game, an item associated with the selected cell, which is determined by the server based on the selection request"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "displaying, during the virtual game, an item associated with the selected cell, which is determined by the server based on the selection request"<br><br>• '708 Patent Claims 1, 3 | plain and ordinary meaning; no construction needed | the server determines what item to display during the virtual game based on the selection request received by the server, and displaying that item |
| "displays an item associated with the selected cell, which is determined by the server based on the selection request"[4]<br><br>• '708 Patent Claim 2 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The meaning of the "displaying . . . an item . . . based on the selection request" term is plain without construction. Defendant's proposed construction improperly requires that the server determines what item to display. In contrast, the claim language plainly

---

[4] In their Joint Claim Construction Chart, the parties misidentify Claim 2 as using the term "displaying" but emphasize Claim 2's "displays" language. '310 Case Dkt. No. 69-1 at 3–4.

rather requires that "the server must only determine 'an item associated with the selected cell.'" Defendant's proposed construction also improperly omits the requirement that the displayed item is "associated with the selected cell." '310 Case Dkt. No. 63 at 11.

Defendant responds: Under a plain reading of the claims, the item displayed is the one determined for display by the server in response to an item-selection request. Further, this is how the operation is described in the '708 Patent and during prosecution of the patent. In other words, "the server determine[s] which of the items previously associated with the cell selected by the user is ultimately displayed to the user." Finally, Defendant does not oppose specifying in the construction that the displayed item is "associated with the selected cell," though that limitation is clear from other claim language. '310 Case Dkt. No. 65 at 12–15.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '708 Patent fig.6, col.12 ll.20–44; '708 Patent File Wrapper March 30, 2017 Amendment at 7–9 (Defendant's Ex. A, Dkt. No. 65-2 at 8–10), April 26, 2018 Amendment at 4 (Defendant's Ex. B, Dkt. No. 65-3 at 5).

Plaintiff replies: "[A]ll the claim requires the server to do is determine 'an item associated with the selected cell,' but the claim does not require the server to determine what item to display." This understanding is consistent with the prosecution history, in which the applicant explained that "'an item associated with the selected cell determined by the server based on the selection request is displayed.'" '310 Case Dkt. No. 68 at 4–6.

Plaintiff cites further **intrinsic evidence** to support its position: '708 Patent col.12 ll.20–44; '708 Patent File Wrapper March 30, 2017 Amendment at 7 (Defendant's Ex. A, Dkt. No. 65-2 at 8).

### Analysis

The issue in dispute distills to whether the server determines what item to display. It does.

The claims provide significant guidance regarding the nature of the "displaying . . . which is determined by the server . . ." limitation. For example, Claim 1 of the '708 Patent provides:

> **1.** A game control method comprising the steps of:
> (a) initializing a virtual game;
> (b) displaying, during the virtual game, ***a plurality of cells and acquirable item information*** that is received from a server over a communication line, the plurality of cells being displayed in the same size, wherein ***each of a plurality of items extracted from an item information table*** pertaining to a user ***is underlined associated with each of the plurality of cells***, the plurality of items being selected randomly only from items in the item information table, and at least one of the cells including a character which indicates a rarity value of an item associated with the at least one of the cells;
> (c) receiving, during the virtual game, ***a selection request selecting one of the plurality of cells*** and sending the selection request to the server; and
> (d) ***displaying, during the virtual game, an item associated with the selected cell, which is determined by the server based on the selection request***.

'708 Patent col.13 l.50 – col.14 l.13 (emphasis added). A plain reading of the claim language indicates that: (1) each of a plurality of extracted items is associated with each of a plurality of cells, (2) one of the cells is selected by a selection request, and (3) an item associated with the selected cell is displayed. The language "which is determined by the server" is found in the "displaying . . . an item associated . . ." clause rather than in the clause that sets forth the association of items with the cells. And "associated" in this clause appears in the past, passive sense. On balance, this most naturally aligns the "determining" with the "displaying" rather than with "associated" or associating. In other words, the "determining" that the server performs indicates a decision to display rather than, e.g., a decision to associate or a conclusion that an item is associated with the selected cell.

Accordingly, the Court construes this term as follows:

- "displaying, during the virtual game, an item associated with the selected cell, which is determined by the server based on the selection request" means "displaying, during the virtual game, an item associated with the selected cell, which item is determined for display by the server based on the selection request" and

- "displays an item associated with the selected cell, which is determined by the server based on the selection request" means "displays an item associated with the selected cell, which item is determined for display by the server based on the selection request."

**A-4.**   **"wherein each of a plurality of items extracted from an item information table pertaining to a user is associated with each of the plurality of the cells"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "wherein each of a plurality of items extracted from an item information table pertaining to a user is associated with each of the plurality of the cells"<br><br>• '708 Patent Claims 1, 2, 3 | plain and ordinary meaning; no construction needed | wherein each of a plurality of items extracted from a table associated with a particular user storing items, is associated with each of the plurality of cells |

**The Parties' Positions**

Plaintiff submits: The meaning of the "wherein each . . . " term is plain without construction. Defendant's proposed construction improperly expands the recited "item information table" to "table" and improperly narrows "pertaining to a user" to "associated with a particular user." '310 Case Dkt. No. 63 at 12–13.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '708 Patent fig.1, col.4 ll.17–23, col.4 ll.38–40.

Defendant responds: This term needs to be construed to clarify what it means for an item information table to "pertain" to a user. As described in the '708 Patent, a combination of multiple tables are used to "associate the cells in the item information table with a particular user . . . ." "[T]he specification teaches cross-referencing and using the combination of user-specific tables to execute the claimed method." '310 Case Dkt. No. 65 at 16–17.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '708 Patent col.4 ll.6–20, col.4 ll.24–26, col.4 ll.38–43, col.5 l.58 – col.6 l.12, col.6 ll.32–38, col.6 ll.54–67, col.11 ll.27–33.

Plaintiff replies: Defendant's proposed construction does more than explain what "pertain" means, it improperly injects limitations. '310 Case Dkt. No. 68 at 6.

<u>**Analysis**</u>

The issue in dispute appears to be whether the requirement of "an item information table pertaining to a user" necessarily requires that the table is associated with a particular user. It does not.

The Court is not persuaded that the '708 Patent's descriptions of embodiments of the invention rise to the exacting standard required to interpret the broad "information table pertaining to a user" as the narrower "table associated with a particular user storing items." Indeed, the patent notes that one table may pertain to multiple users: "For example, in Embodiments 1 to 3, a separate one of the item information tables 111a to 111c is associated with each user identification number, yet for example a plurality of users may share one of the item information tables 111a to 111c." '708 Patent col.13 ll.29–33. Ultimately, the meaning of "pertain to" is readily accessible without construction, and it is not limited as Defendant suggests.

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### A-5.    The Associated-Memory Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "associating, in a memory of the game server, each of a plurality of cells with each of extracted items extracted from the memory"<br><br>• '832 Patent Claim 1 | plain and ordinary meaning; no construction needed | indefinite |
| "a memory in which each of a plurality of cells is associated with each of extracted items extracted from the memory"<br><br>• '832 Patent Claim 4 | | |
| "associating, in a memory of the computer, each of a plurality of cells with each of extracted items extracted from the memory"<br><br>• '832 Patent Claim 9 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The meanings of these terms are "clear and definite." '310 Case Dkt. No. 63 at 13–15.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '708 Patent fig.1, col.4 ll.9–14.

Defendant responds: These limitations include a fatal grammatical flaw; namely, "either they are a missing an article before 'extracted items,' or they contain an extra 'of' in 'each of extracted items.'" Thus, it is unclear whether each cell of the plurality of cells may be associated with only one of the extracted items or must be associated with all of the extracted items, or perhaps some other interpretation applies. '310 Case Dkt. No. 65 at 18–19.

Plaintiff replies: At worst, Defendant has identified a potential typographical error that the Court may correct by inserting the article "the" into the term to clarify that "each of extracted items" meant "each of the extracted items." '310 Case Dkt. No. 68 at 6–8.

**<u>Analysis</u>**

The issue in dispute is whether the meanings of these Associated-Memory Terms are reasonably certain in the context of the claims and the rest of the intrinsic record. Defendant has not established that the meanings are not reasonably certain.

The Court finds no typographical error or other source of uncertainty in the phrase "each of extracted items." The term "extracted items" here is plural, and thus cannot be introduced with the singular indefinite article "an." And there is no previous recitation of "extracted items" such that introducing it with "the" would have clarified meaning. In such a situation, it is not uncommon for a claims drafter to forego any introductory article for the plural term. Perhaps a more elegant approach would have been to draft "a plurality of extracted items" instead of simply "extracted items," but the Court understands the two constructs to plainly have identical meaning. Thus, it is reasonably certain that "associating . . . each of a plurality of cells with each of extracted items," and variants, plainly means the same as "associating . . . each of a plurality of cells with each item of a plurality of extracted items." In other words, each cell is associated with each item.

Accordingly, Defendant has failed to prove any claim is indefinite for inclusion of one the Associated-Memory Terms.

### A-6. "[sending information to a user terminal for displaying, in a virtual game,] a sheet comprising the plurality of cells and obtainable item information" and "[send information to a user terminal for displaying, in a virtual game,] a sheet comprising the plurality of cells and obtainable item information"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "[sending information to a user terminal for displaying, in a virtual game,] a sheet comprising the plurality of cells and obtainable item information"<br><br>• '832 Patent Claims 1, 9 | plain and ordinary meaning; no construction needed | sending information to a user terminal which is displayed in a plurality of cells and includes at least obtainable item information necessary to display an image of a table with a plurality of cells and obtainable item information |
| "[send information to a user terminal for displaying, in a virtual game,] a sheet comprising the plurality of cells and obtainable item information"<br><br>• '832 Patent Claim 4[5] | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The meanings of these terms are plain without construction. Defendant's proposed construction improperly omits the "sheet" limitation and improperly injects "which is displayed in a plurality of cells and includes at least obtainable item information" and "necessary

---

[5] The parties identified '832 Patent Claim 4 with the claim language "sending information." '310 Case Dkt. No. 69 at 3. But while Claims 1 and 9 include the "sending information" language, Claim 4 recites "send information."

to display an image of a table with a plurality of cells and obtainable item information" limitations. '310 Case Dkt. No. 63 at 15–16.

Defendant responds: These terms should be construed to clarify "otherwise vague claim language." As described in the '832 Patent, the "sheet" is the "scratch card" depicted in Figures 9, 10A, and 10B and the "obtainable item information" is the "separate 'acquirable item information' table." The display of "acquirable item information" is repeatedly and consistently characterized in the patent as display of a multi-cell table. The claims should be construed to clarify this "table" aspect. Further, such a construction is supported by the applicant's distinction of a prior-art reference during prosecution of the '832 Patent; namely, applicant argued that the "total number of items for each item type" in the prior art "is not displayed on the sheet of cells in Figure 7." '310 Case Dkt. No. 65 at 19–22.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '832 Patent figs.5, 7A, 7B, 8, 9, 10A, 10B, col.1 ll.60–62, col.2 ll.27–29, col.2 ll.61–64, col.5 ll.10–19, col.11 ll.44–52, col.12 ll.46–55; '832 Patent File Wrapper February 21, 2019 Applicant-Initiated Interview Summary (Defendant's Ex. C, Dkt. No. 65-4).

Plaintiff replies: As the '832 Patent expressly explains, the examples of "acquirable item information" described in the patent "are not limiting." And the prosecution-history distinction over the prior art was that "'an area of stored memory … is not displayed on the sheet of cells.'" This does not require "obtainable item information" to be displayed in a table. '310 Case Dkt. No. 68 at 8–9.

Plaintiff cites further **intrinsic evidence** to support its position: '708 Patent col.10 ll.57–64.

27

## Analysis

The dispute appears to distill to two issues. First, whether the obtainable item information is necessarily displayed as a multi-cell table. It is not. Second, whether the obtainable item information necessarily includes information necessary to display an image of a table. It does not.

The meanings of the terms in dispute are readily accessible and the Court is not persuaded that the '708 and '832 Patents' descriptions of embodiments of the invention, or the applicant's argument during prosecution of the '832 Patent, rise to the exacting standard required to interpret the broad claim language to include the narrowing limitations Defendant proposes.

Accordingly, the Court rejects Defendant's proposed construction and determines that these terms have their plain and ordinary meanings without the need for further construction.

### A-7. "send[ing] information for differentiating, in the virtual game, a display of the one cell from another cell of the plurality of cells in the sheet, wherein the differentiating of the display of the one cell is done in response to the selection request to select the one cell"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "sending information for differentiating, in the virtual game, a display of the one cell from another cell of the plurality of cells in the sheet, wherein the differentiating of the display of the one cell is done in response to the selection request to select the one cell"<br><br>• '832 Patent Claims 1, 9 | plain and ordinary meaning; no construction needed | sending information to a user terminal for differentiating in the display the one cell from another of the plurality of cells in the sheet wherein the differentiating of the display of the one cell on the sheet of a plurality of cells is done in accordance with the information sent to the user terminal in response to a selection request transmitted from the user terminal to select the one cell |

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "send information for differentiating, in the virtual game, a display of the one cell from another cell of the plurality of cells in the sheet, wherein the differentiating of the display of the one cell is done in response to the selection request to select the one cell"<br><br>• '832 Patent Claim 4 | plain and ordinary meaning; no construction needed | send information to a user terminal for differentiating in the display the one cell from another of the plurality of cells in the sheet wherein the differentiating of the display of the one cell on the sheet of a plurality of cells is done in accordance with the information sent to the user terminal in response to a selection request transmitted from the user terminal to select the one cell |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The meanings of these terms are plain without construction. Defendant's proposed construction improperly adds the "superfluous limitation" requiring sending to a user terminal, improperly omits the "in the virtual game" limitation, and improperly narrows the claims to require differentiating "in accordance with the information sent to the user terminal" and to require the selection request is "transmitted from the user terminal." '310 Case Dkt. No. 63 at 16–17.

Defendant responds: These terms should be construed to clarify that "'sending' of 'information for differentiating' must be from the server to the user terminal, and must be done in response to the selection request made by the user on the user terminal." As described in the '832 Patent, "the differentiation display is in accordance with the item and item information sent from the server to the user terminal (the item detail) in response to a selection request transmitted from the user terminal to select the one cell." And during prosecution of the '832 Patent, the applicant

distinguished a prior-art reference on the ground that the prior art "'does not differentiate the display of a selected cell from that of another cell . . . There is no differentiation of display of cells based on which cell is selected, as claimed'" (quoting '832 Patent File Wrapper February 21, 2019 Applicant-Initiated Interview Summary). Thus, the applicant explained that "there is a causal connection between the selection and display differentiation." '310 Case Dkt. No. 65 at 22–26.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '832 Patent figs.6, 10A, 10B, col.2 ll.18–23, col.2 ll.52–57, col.3 ll.18–23, col.6 l.65 – col.7 l.18, col.7 ll.22–31, col.12 ll.37–41; '832 Patent File Wrapper February 21, 2019 Applicant-Initiated Interview Summary (Defendant's Ex. C, Dkt. No. 65-4), April 2, 2019 Amendment at 2–4, 7 (Defendant's Ex. D, Dkt. No. 65-5 at 3–5, 8).

Plaintiff replies: That the claims elsewhere express that some information is sent to a user terminal does not mean that all information that is sent is sent to a user terminal. Further, nothing in the prosecution history justifies that the differentiation is necessarily "in accordance with the information sent to the user terminal." Rather, the applicant noted that the "'differentiation . . . is done in response to the selection request,'" as recited in the claim. '310 Case Dkt. No. 68 at 9–10.

<u>**Analysis**</u>

There appear to be two main issues in dispute. First, whether "send[ing] information for differentiating" necessarily requires sending the information to the user terminal. It does not. Second, whether "differentiating . . . done in response to the selection request" necessarily requires differentiating in accordance with the information sent to the user terminal in response to a selection request transmitted from the user terminal. It does not.

The claims provide significant guidance regarding the nature of sending information for differentiating a display and how the differentiating relates to the selection request. For example, Claim 4 of the '832 Patent provides:

> **4**. A game server comprising:
> a memory in which each of a plurality of cells is associated with each of extracted items extracted from the memory; and
> *a controller* configured to
>> send information to a user terminal for displaying, in a virtual game, a sheet comprising the plurality of cells and obtainable item information, the obtainable item information comprising at least one of (i) a total number of items for each item type, (ii) a number of obtained items and (iii) a number of un-obtained items,
>> receive, in the virtual game, a selection request from the user terminal to select one cell among the plurality of cells,
>> *send information for differentiating*, in the virtual game, *a display* of the one cell from another cell of the plurality of cells in the sheet, wherein the *differentiating of the display of the one cell is done in response to the selection request* to select the one cell, and
>> provide, in the virtual game, an item of the extracted items that is associated with the one cell to a user of the user terminal.

'832 Patent col.14 ll.9–33 (emphasis added). Here, it is clear that the controller is that which is configured to send the information for differentiating a display of one cell from another, and that the differentiating is done in response to the selection request. But the claim does not specify that the information is sent "to a user terminal" or that the differentiating is "done in accordance with the information sent to the user terminal in response to the selection request."

Again, the meanings of the terms in dispute are readily accessible and the Court is not persuaded that the '708 and '832 Patents' descriptions of embodiments of the invention, or the applicant's argument during prosecution of the '832 Patent, rise to the exacting standard required to interpret the broad claim language to include the narrowing limitations Defendant proposes.

The Court further declines to require that the "selection request" is "transmitted from the user terminal." The claims expressly require "receiving" or "receive" the selection request "from the user terminal." No further clarification is required. And to the extent that "transmitted from the

user terminal" imposes an additional limitation, Defendant has not justified further limiting the claims.

Accordingly, the Court rejects Defendant's proposed construction and determines that these terms have their plain and ordinary meanings without the need for further construction.

### A-8.   "providing" and "provide"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "providing"<br><br>• '832 Patent Claims 1, 9 | plain and ordinary meaning; no construction needed | providing in response to the selection request |
| "provide"<br><br>• '832 Patent Claim 4 | plain and ordinary meaning; no construction needed | provide in response to the selection request |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The meanings of these terms are plain without construction. Defendant's proposed construction improperly requires that the providing is necessarily "in response to the selection request." '310 Case Dkt. No. 63 at 18–19.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '832 Patent col.2 ll.52–57.

Defendant responds: In the context of the "surrounding claim language and specification," the provide/providing of the claims is necessarily in response to the selection request. Specifically, the claims require provide/providing an item that is "associated with the one cell" and "the one cell" refers to the cell that is the object of the recited "selection request . . . to select one cell." "It would be impossible to provide an 'item[] that is associated with the one cell' if not done in response to the selection request in which the one cell was selected." And as consistently described in the '832

32

Patent, the server provides the item in response to receiving the selection request—"the server determines what item to provide and provides that item." Indeed, providing the item in response to the selection request is necessary to achieve the described benefits of the invention. '310 Case Dkt. No. 65 at 27–29.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '832 Patent fig.6, col.1 ll.47–53, col.2 ll.18–23, col.2 ll.52-57, col.3 ll.18–23, col.6 l.65 – col.7 l.28; '708 Patent File Wrapper March 30, 2017 Amendment at 8–9 (Defendant's Ex. A, Dkt. No. 65-2 at 9–10).

Plaintiff replies: As shown in Figure 6 of the '832 Patent, the item may be provided in response to determining an item to provide rather than in response to a selection request. '310 Case Dkt. No. 68 at 10.

Plaintiff cites further **intrinsic evidence** to support its position: '708 Patent col.7 ll.22–24.

<u>**Analysis**</u>

The issue in dispute is whether the provide/providing recited in the claims is necessarily in response to the selection request. It is not. Rather, the providing is "based on" the selection request.

The claims provide significant guidance regarding the nature providing an item and the relationship of the providing to the selection request. For example, Claim 4 of the '832 Patent provides:

> **4**. A game server comprising:
> a memory in which each of a plurality of cells is associated with each of
>   extracted items extracted from the memory; and
> a controller configured to
>     send information to a user terminal for displaying, in a virtual game, a
>       sheet comprising the plurality of cells and obtainable item information,
>       the obtainable item information comprising at least one of (i) a total
>       number of items for each item type, (ii) a number of obtained items and
>       (iii) a number of un-obtained items,

>receive, in the virtual game, a ***selection request*** from the user terminal to select one cell among the plurality of cells,
>
>send information for differentiating, in the virtual game, a display of the one cell from another cell of the plurality of cells in the sheet, wherein the differentiating of the display of the one cell is done in response to the selection request to select the one cell, and
>
>***provide***, in the virtual game, ***an item of the extracted items that is associated with the one cell to a user of the user terminal***.

'832 Patent col.14 ll.9–33 (emphasis added). Here, it is clear that the controller is configured to provide an item that is associated with "the one cell" that is the object of the "selection request." Thus, the item provided is based on the selection request. Indeed, this is how the invention is described in the patent. *See, e.g.*, '832 Patent col.2 ll.522–57 ("In the game server according to the present invention, ***based on a selection request*** from the communication terminal, the control means may ***determine one item*** selected from among items for which the count of necessary attempts for acquisition is at most the predetermined value ***to be the item to provide***." (emphasis added)). While the providing is clearly "based on" the selection request, the Court is not persuaded it is necessarily "in response to" the selection request, as Defendant contends.

Accordingly, the Court construes these terms as follows:

- "providing" means "providing based on the selection request" and

- "provide" means "provide based on the selection request."

### B.      Case No. 2:19-cv-311

#### B-1.     "game pieces"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "game pieces"<br><br>• '107 Patent Claims 1, 9, 10<br>• '439 Patent Claims 1, 6, 7 | plain and ordinary meaning; no construction needed<br><br>alternatively,<br>• pieces for use in the game | game pieces, of a set of game pieces, constituting one game item |

**The Parties' Positions**

Plaintiff submits: The meaning of the term "game pieces" is plain without construction. Defendant's proposed construction improperly limits the game pieces to a "set" and requires that the pieces "constitute one game item." The '107 and '439 Patents' description of game-piece sets and game pieces that constitute a game item are exemplary and thus should not be imported into the claims. Further, Defendant's proposed construction does not clarify the meaning of "game pieces" as "game pieces" appears in the construction directly and also through the construction of "game item," meaning the proposed construction of "game pieces" is circular. '311 Case Dkt. No. 62 at 7–9.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent col.23 ll.35–46.

Defendant responds: The difference between "game pieces" and "game item" will not be readily apparent to a juror and thus "game pieces" (and "game item") must be construed to explain the distinction between the terms. As described in the intrinsic record, the "game pieces" are pieces of the "game item" and "must constitute one game item." More specifically, "the game pieces are part of *a set* of game pieces constituting the one game item" (Defendant's emphasis). '311 Case Dkt. No. 64 at 8–11.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '107 Patent, at [57] Abstract, figs.13, 16, 17, col.2 ll.23–53, col.17 ll.47–56, col.18 ll.40–44, col.18 ll.48–50, col.18 ll.56–58, col.19 ll.6–8, col.19 ll.27–29, col.19 ll.46–48, col.21 ll.5–9, col.22 l.6, col.22 l.39 – col.23 l.7, col.23 ll.40–44, col.23 ll.52–57; '107 Patent File Wrapper March 4, 2015 Amendment at 11 (Defendant's Ex. B, Dkt. No. 64-3 at 12); '439 Patent File Wrapper June 7, 2016 Amendment (Defendant's Ex. C, Dkt. No. 64-4).

Plaintiff replies: A juror will be able to understand "game pieces" and "game item" in the context of the claims, so construction is not necessary. Further, the '107 and '439 Patents describes a variety of rewards that may be acquired by accumulating game pieces, some of which are not items composed of game pieces. '311 Case Dkt. No. 68 at 3–4.

Plaintiff cites further **intrinsic evidence** to support its position: '107 Patent col.5 ll.17–19, col.17 ll.54–56; '107 Patent File Wrapper March 4, 2015 Amendment at 11 (Defendant's Ex. B, Dkt. No. 64-3 at 12); '439 Patent File Wrapper June 7, 2016 Amendment at 9 (Defendant's Ex. C, Dkt. No. 64-4 at 10).

### <u>Analysis</u>

The dispute distills to two issues: First, whether the "game pieces" are necessarily of a set of game pieces associated with one game item. They are not. Second, whether the "game pieces" necessarily constitute one game item. They do not.

The claims provide significant guidance regarding the nature of the "game pieces" and their relationship to the "game item." For example, Claim 1 of the '107 Patent provides:

> 1. A game control method carried out by a game control device for providing a game to a plurality of communication terminals respectively used by a plurality of users, the game control device communicating with the plurality of communication terminals and having a storage unit, the method comprising the steps of:
> (a) storing skill level information indicative of skill levels of each of the plurality of users of the game, in the storage unit;
> (b) grouping the plurality of users into one or more groups;
> (c) providing one or more of a plurality of *game pieces* to a first plurality of users in a first group of said one or more groups, based on the skill level information, while the first plurality of users are at certain events in the game;
> (d) storing allocation information indicating which game piece has been provided to which user with a respective skill level, and *a number and type of game pieces required to obtain a <u>game item</u> as a reward*, in the storage unit;
> (e) determining *whether all of the <u>game pieces</u> required to obtain said game item have been provided* to the first group, based on the allocation information stored in the storage unit; and

      (f) ***allocating in a memory, the <u>game item</u> to the first group or at least one of the first plurality of users, when it is determined that all the required <u>game pieces</u> have been provided***.

'107 Patent col.24 l.65 – col.25 l.24 (emphasis added). It is clear from the express claim language that: (1) game pieces are provided to players during the course of the game, and (2) a game item is allocated to a group of players, or at least one of the players in the group, when the group has collectively acquired all the game pieces required to get the item. Notably, the claim does not express (1) that the provided game pieces are restricted to a set associated with the item or (2) the game pieces "constitute" a game item.

      The Court rejects Defendant's proposal to limit "game pieces" to the constituent pieces of one game item. First, the patents describe collecting game pieces associated with different items. For example, the patent describes users collecting pieces that are each exclusively associated with one of four jewels ("A" through "D"). '107 Patent col.18 l.46 – col.19 l.64. The group of users (a "guild") is rewarded with all the jewels for which the users have collected all the pieces. *Id*. at col.22 l.65 – col.23 l.7. In other words, the users may collect some or all the pieces for jewel "A," "B," "C," and "D." Thus, the game pieces are not necessarily associated with "one" game item— the game pieces are collectively associated with up to four items in this example. Second, the game pieces that are associated with the same item do not necessarily constitute that item. For example, the patents describe providing various types of rewards. *Id*. at col.17 ll.47–56 ("The rewards that can be obtained in the guild event include, for example, various kinds of card characters, items, etc."). And the game "gives a reward in ***accordance*** with all of the given game pieces." *Id*. at col.22 l.65 – col.23 l.7 (emphasis added). Further, the claims allow that the rewarded game item may be provided to more than one user, indicating that multiple items of the same type are rewarded. For example, each user in the group may be allocated "the type of jewel whose pieces

are all collected." *Id*. This indicates that the game pieces are not necessarily pieces of the game item.

On balance, and as plainly stated in the claims, the "game pieces" are pieces used and collected in the game to merit allocation of a "game item" when all the required game pieces for that item are provided to the group of users. The game pieces are not necessarily pieces "constituting one game item."

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### B-2.   "game item"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "game item"<br><br>• '107 Patent Claims 1, 9, 10<br>• '439 Patent Claims 1, 6, 7 | plain and ordinary meaning; no construction needed<br><br>alternatively,<br>• item for use in the game | a reward for the group for collecting the predetermined required number and type of game pieces |

**The Parties' Positions**

Plaintiff submits: The meaning of the term "game item" is plain without construction. Defendant's proposed construction improperly limits the game item by injecting a "collecting the predetermined required number and type of game pieces" limitation. This limitation is not justified by the intrinsic record and is inconsistent with the described embodiments that "do not require a given type of game pieces to be collected." '311 Case Dkt. No. 62 at 9–11.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent col.5 ll.16–20, col.23 ll.44–46.

38

Defendant responds: As described in the '107 and '439 Patents, a "game item" is a reward for collecting the required set of game pieces. And the patents explain that the requirement criteria include the type of game pieces and the number of game pieces. '311 Case Dkt. No. 64 at 11–14.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '107 Patent, at [57] Abstract, figs.13, 14, 16, 17, col.2 ll.7–11, col.2 ll.30–53, col.17 ll.47–56, col.18 l.37 – col.19 l.64, col.22 l.9 – col.24 l.9; '107 Patent File Wrapper March 4, 2015 Amendment at 11 (Defendant's Ex. B, Dkt. No. 64-3 at 12); '439 Patent File Wrapper June 7, 2016 Amendment (Defendant's Ex. C, Dkt. No. 64-4).

Plaintiff replies: As described in the patents, considering the "type" of game pieces in determining whether the game item should be allocated is exemplary. Other embodiments simply look to whether "'all of the . . . game pieces are given'" (quoting '107 Patent col.2 ll.50–52). Further, a "type" limitation is expressed in the claims of the '107 Patent but not in the claims of the '439 Patent. Finally, Defendant proposes a "predetermined" limitation but does not offer any explanation or support for this limitation. And the patents describe some requirement criteria as "predetermined" and others as not (citing *id*. at col.2 ll.50–52, col.17 l.52, col.23 ll.40–49). '311 Case Dkt. No. 68 at 4–6.

Plaintiff cites further **intrinsic evidence** to support its position: '107 Patent fig.17, col.2 ll.50–52, col.17 l.52, col.22 ll.9–15, col.23 ll.40–49; '439 Patent File Wrapper June 7, 2016 Amendment at 9 (Defendant's Ex. C, Dkt. No. 64-4 at 10).

### <u>Analysis</u>

The issue in dispute appears to be whether the game item allocated to the player group (or at least a player in the group) is allocated only when a "predetermined required number and type" of game pieces are provided to the group. The claims express that the game item is allocated when

"all the required game pieces have been provided" to the group (or users in the group). The claims do not, however, express that "required" here means a "predetermined required number and type" and the Court declines to read in such a limitation.

The claims provide significant guidance regarding the nature of "game item" and its relationship to the "game pieces." As set forth in the "game pieces" section above, Claim 1 of the '107 Patent makes clear that a game item is allocated to the group when the group has collectively acquired the game pieces required for the reward. Claim 1 further specifies "storing . . . a number and type of game pieces required to obtain a game item as a reward," indicating that the "game item" in Claim 1 is associated with game pieces of a certain type and number. '107 Patent col.25 ll.13–15.

Claim 7 of the '439 Patent is similar in many respects to Claim 1 of the '107 Patent. Claim 7 provides:

> **7**. A non-transitory computer readable recording medium for storing a program that causes a processor of a game control device to execute a process, the game control device providing a game to a plurality of communication terminals respectively used by a plurality of users over a communication network, and having a storage unit, the process comprising the steps of:
> (a) grouping the plurality of users into one or more groups;
> (b) storing a correspondence between the plurality of users and the one or more groups in the storage unit;
> (c) transmitting information over the communication network to initiate a group event in which a first plurality of users forming a first group cooperatively participate in the game;
> (d) storing a parameter value for each of the plurality of users, wherein the parameter value for a respective user is increased as the respective user makes progress in the group event;
> (e) monitoring progress of the group event and updating the parameter value for each of the first plurality of users in accordance with the progress of the first group in the group event;
> (f) providing at least one of a plurality of *game pieces* to each of the first plurality of users in the group event, based on the parameter value for the corresponding user, *wherein the plurality of <u>game pieces</u> are required to obtain a <u>game item</u>*;

(g) storing allocation information indicating which game piece has been provided to which user, in the storage unit;

(h) determining *whether all the required* *game pieces* *have been provided* to the first plurality of users, based on the allocation information; and

(i) *allocating in a memory, the* *game item* *to the first group or at least one of the first plurality of users, when it is determined that all the required* *game pieces* *have been provided within a predetermined period of time during which the group event is taking place*.

'439 Patent col.26 l.54 – col.28 l.17 (emphasis added). It is clear from the express claim language that: (1) game pieces are provided to players during the course of the game, and (2) a game item is allocated to a group of players, or at least one of the players in the group, when the group has collectively acquired the game pieces required to get the item. Notably, the claim does not express the game piece requirement as "a number and type of game pieces required to obtain a game item as a reward," as is expressed in Claim 1 of the '107 Patent.

The Court rejects Defendant's proposal to inject a "predetermined . . . number and type" limitation. That some claims express a "number and type" limitation and others do not suggests that a "number and type" requirement is not inherent to a "game item." *See Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive. To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). And Defendant has not provided any persuasive argument or evidence for including a "predetermined" limitation.

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### B-3.    The Skill-Level Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "skill level information"<br><br>• '107 Patent Claims 1, 9, 10 | plain and ordinary meaning; no construction needed<br><br>alternatively,<br>• information associated with the player's skill | Defendant proposes construing this term as part of the later limitation. |
| "providing one or more of a plurality of game pieces to a first plurality of users in a first group of said one or more groups, based on the skill level information, while the first plurality of users are at certain events in the game"<br><br>• '107 Patent Claims 1, 9, 10 | See constructions of "skill level information" and "game pieces." Otherwise. plain and ordinary meaning; no construction needed. | providing one or more of a plurality of game pieces to a first plurality of users in a first group of said one or more groups while the first plurality of users are at certain events in the game, based on the skill level information where users with a lower skill level are provided with a game piece within a certain range of game pieces and users with a higher skill level are provided a game piece within a different range of game pieces |
| "the plurality of game pieces are respectively provided to users with skill levels in different ranges with different probabilities, based on the skill level information"<br><br>• '107 Patent Claim 4 | See constructions of "skill level information" and "game pieces." Otherwise. plain and ordinary meaning; no construction needed. | the plurality of game pieces, with information identifying individual game pieces, are respectively provided to users where users with a lower skill level are provided with a game piece within a certain range of game pieces and users with a higher skill level are provided a game piece within a different range of game pieces in accordance with predetermined probabilities based on ranges of skill level information |

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the plurality of game pieces are respectively provided to users with skill levels in different ranges, based on the skill level information"<br><br>• '107 Patent Claim 5 | See constructions of "skill level information" and "game pieces." Otherwise. plain and ordinary meaning; no construction needed. | the plurality of game pieces, with information identifying individual game pieces, are respectively provided to users based on ranges of skill level information where users with a lower skill level are provided with a game piece within a certain range of game pieces and users with a higher skill level are provided a game piece within a different range of game pieces |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: The meanings of the term "skill level" and the terms that include that phrase are plain without construction. Defendant's proposed constructions improperly require users at different skill levels to receive different game pieces based on a range of skill levels. The claims do not express such a limitation and importation of such a limitation is not supported by the intrinsic record. Indeed, the patents teach providing the same pieces irrespective of the players' skill levels but varying the probability that such a piece will be provided based on skill levels (citing '107 Patent col.19 ll.43–64). Plus, the patents teach providing pieces based on skill level without any reference to a range of skill level (citing *id.* at col.21 ll.10–14). Defendant's proposals also improperly inject a "predetermined" probabilities limitation. Finally, Defendant improperly injects a "with information identifying individual game pieces" limitation into the claims. '311 Case Dkt. No. 62 at 11–15.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent fig.14, col.2 ll.30–52, col.17 ll.47–51, col.19 ll.43–64, col.21 ll.10–14.

Defendant responds: As described in the '107 and '439 Patents, the game pieces are provided to users based on user-skill-level ranges. Some pieces are more likely to be provided to low-level users, others to intermediate-level users, and others to high-level users. This skill-level allocation of pieces is necessary to overcome a disparaged element of the prior art; namely, high-level users avoiding low-level users in cooperative play. And the patents state that "each game piece is given to users at levels in different ranges as a result" (quoting '107 Patent col.21 ll.35–38). As described, the skill-level allocation is accomplished by associating skill-level ranges with predetermined probabilities of game-piece appearance. Finally, in order to avoid a disparaged element of the prior art, the patents require that the game pieces be associated with information "maintained on an individual user basis, including a piece ID that is 'an identifier for identifying each of a plurality of pieces constituting each jewel' and a user ID" (citing '107 Patent figs.13–14, col.18 ll.46–50, col.19 l.65 – col.20 l.22). '311 Case Dkt. No. 64 at 14–19.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '107 Patent figs.13, 14, col.2 ll.7–25, col.18 ll.37–40, col.18 ll.46–50, col.18 l.53 – col.20 l.22, col.21 ll.10–25, col.21 ll.35–38, col.23 ll.35–57; '107 Patent File Wrapper March 4, 2015 Amendment at 11 (Defendant's Ex. B, Dkt. No. 64-3 at 12).

Plaintiff replies: Nothing in the intrinsic record supports importing Defendant's proposed limitations. Rather, the disclosures that Defendant rely upon are exemplary, not definitional. '311 Case Dkt. No. 68 at 6–7.

Plaintiff cites further **intrinsic evidence** to support its position: '107 Patent col.2 ll.23–25, col.23 ll.52–57.

**Analysis**

There appear to be four issues in dispute. First, whether "providing . . . game pieces . . . based on the skill level information" necessarily requires providing the pieces based on skill-level ranges. It does not. Second, whether "providing . . . game pieces . . . based on the skill level information" necessarily requires providing different pieces to different users based on skill level. It does not. Third, whether the providing pieces to "users with skill levels in different ranges with different probabilities" necessarily requires use of "predetermined" probabilities. It does not. Finally, whether the game pieces of Claims 4 and 5 of the '107 Patent necessarily are "with information identifying individual game pieces." They are not.

The claims provide significant guidance regarding the nature of the "skill level" limitations. For example, Claims 4 through 6 of the '107 Patent, which all depend from Claim 1, recite as follows:

> 1. A game control method carried out by a game control device for providing a game to a plurality of communication terminals respectively used by a plurality of users, the game control device communicating with the plurality of communication terminals and having a storage unit, the method comprising the steps of:
> (a) storing ***skill level information*** ***indicative of skill levels of each of the plurality of users*** of the game, in the storage unit;
> (b) grouping the plurality of users into one or more groups;
> (c) ***providing one or more of a plurality of game pieces*** to a first plurality of users in a first group of said one or more groups, ***based on the*** ***skill level*** ***information***, while the first plurality of users are at certain events in the game;
> (d) storing allocation information indicating which game piece has been provided to which user with a respective skill level, and a number and type of game pieces required to obtain a game item as a reward, in the storage unit;
> (e) determining whether all of the game pieces required to obtain said game item have been provided to the first group, based on the allocation information stored in the storage unit; and
> (f) allocating in a memory, the game item to the first group or at least one of the first plurality of users, when it is determined that all the required game pieces have been provided.

4. The game control method according to claim **1,** wherein in step (c), the plurality of ***game pieces are respectively provided to users with skill levels in <u>different ranges</u> with different probabilities***, based on the skill level information.

5. The game control method according to claim **1,** wherein in step (c), the plurality of ***game pieces are respectively provided to users with skill levels in <u>different ranges</u>***, based on the skill level information.

6. The game control method according to claim **1,** wherein in step (c), ***each, of the plurality of game pieces is only provided to users with skill levels in a <u>predetermined range</u>***, based on the skill level information.

'107 Patent col.24 l.65 – col.25 l.47 (emphasis added). It is clear from the express language of the claims that: (1) Claim 1 requires provision of pieces "based on the skill level information," (2) Claim 4 narrows Claim 1 to provision of "users with skill levels in different ranges with different probabilities," (3) Claim 5 narrows Claim 1 to provision of "users with skill levels in different ranges," and (4) Claim 6 narrows Claim 1 to ***exclusive*** provision of "users with skill levels in a predetermined range."

The Court rejects Defendant's "range" limitations. That providing pieces based on "skill levels in different ranges" expressly appears in Claim 5 suggests that such a limitation is not inherent to "providing . . . game pieces . . . based on the skill level information." And the Court is not persuaded that the '107 Patent's descriptions of embodiments of the invention or the goals of the invention rise to the exacting standard required to read a "range" limitation into all the claims.

The Court also rejects Defendant's restriction of provision of game pieces exclusively to certain users based on their skill level. Such a limitation is expressed in Claim 6 ("***only*** to users with skill levels in a predetermined range"), which suggests that such a limitation is not inherent to "providing . . . game pieces . . . based on the skill level information." Further, Defendant's proposal contradicts the description of the invention, which expressly allows provision of any game pieces to users of any skill level. For example, the '107 Patent teaches that "[i]t may also be

46

possible to cause the pieces Al to A6 also to appear for users other than low-level users with a low probability or to prevent the pieces Al to A6 from appearing for users other than low-level users." '107 Patent col.18 l.67 – col.19 l.3. This expressly teaches that the pieces A1 to A6 (of jewel "A") may be provided to any users, perhaps according to different probabilities, or to only low-level users. Defendant excludes the to-any-user embodiment.

The Court also rejects Defendant's "predetermined probabilities" limitation. That Claim 6 recites "skill levels in a predetermined range" and Claim 4 and 5 recite ranges without reference "predetermined" suggests that the claims express "predetermined" when such a limitation is required. The Court is not persuaded that the '107 Patent's description of embodiments of the invention or the goals of the invention rise to the exacting standard required to read a "predetermined probabilities" limitation into claims that recite simply "probabilities."

Finally, the Court rejects Defendant's "with information identifying individual game pieces" limitation. To begin, it is not clear why such a limitation should be read into Claims 4 and 5 but not into the other claims. Defendant appears to argue that "with information identifying individual game pieces" is an inherent aspect of the invention and therefore must be read into the claims. But this argument, if it applies, should apply to all claims. In any event, the Court is not persuaded that the '107 Patent's description of embodiments of the invention or the goals of the invention rise to the exacting standard required to read a "with information identifying individual game pieces" limitation into any claims.

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### B-4.    The Allocation-Information Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "allocation information indicating which game piece has been provided to which user"<br><br>• '107 Patent Claims 1, 9, 10<br>• '439 Patent Claim 1, 6, 7 | See construction of "game pieces." Otherwise. plain and ordinary meaning; no construction needed. | information identifying the specific game piece provided to a specific user, indicating which individual game piece has been provided to which individual user |
| "determining whether all of the game pieces required to obtain said game item have been provided to the first group, based on the allocation information stored in the storage unit"<br><br>• '107 Patent Claims 1, 9, 10 | See constructions of "game pieces" and "game items." Otherwise. plain and ordinary meaning; no construction needed. | determining whether all of the constituent game pieces required to obtain said game item have been provided to the first group, by checking the allocation information stored in the storage unit |
| "determining whether all the required game pieces have been provided to the first plurality of users, based on the allocation information"<br><br>• '439 Patent Claims 1, 6, 7 | See construction of "game pieces." Otherwise. plain and ordinary meaning; no construction needed. | determining whether the allocation information indicates that each user of the first group has received a game piece and the first group, collectively, has been provided the set of game pieces constituting a game item |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: The meanings of these Allocation-Information terms are plain without construction. Defendant's proposed constructions improperly inject limitations that tie the allocation information to specific game pieces and specific users. The '107 Patent describes allocation information as including "game pieces generally provided to users as opposed to individual game pieces provided to individual users." (citing '107 Patent col.17 ll.62–66, col.23

ll.38–46). With respect to the "determining . . ." limitation in the '107 Patent, Defendant's proposal improperly replaces "game pieces" with "constituent game pieces" and "based on" with "by checking." With respect to the "determining …" limitation in the '439 Patent, Defendant's proposal improperly: (1) replaces "based on the allocation information" with "the allocation information indicates," (2) requires that "each user" receive a game piece, and (3) "rewrites 'whether all the required game pieces have been provided to the first plurality of users' as 'whether . . . the first group, collectively, has been provided the set of game pieces." '311 Case Dkt. No. 62 at 15–18.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent col.17 ll.62–66, col.22 ll.15–21, col.22 ll.39–43, col.22 ll.65–66, col.23 ll.38–46.

Defendant responds: A plain reading of "indicating which game piece has been provided to which user" requires that the indicating specify the individual game piece and the individual user to which it was provided. Indeed, identifying the game pieces and the users to which the pieces have been provided is key to the invention. In the "determining . . ." limitation in the '107 Patent, the "game pieces" are "constituent game pieces" for the reasons provided for the construction of "game pieces" and the "determining . . ." is described in the patents as checking the allocation information. In the "determining . . ." limitation of the '439 Patent, the patents describe that the "determining . . . " involves specifying "game pieces given to each of a plurality of users" and then determining whether "all of the game pieces are given to the" plurality of users (quoting '107 Patent col.22 ll.29–43). '311 Case Dkt. No. 64 at 20–24.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '107 Patent fig.14, col.2 ll.39–52, col.17 ll.62–66, col.20 ll.3–22, col.21 ll.39–

44, col.22 ll.29–60, col.23 ll.38–46; '439 Patent File Wrapper June 7, 2016 Amendment at 13 (Defendant's Ex. C, Dkt. No. 64-4 at 14).

Plaintiff replies: Nothing in the intrinsic record justifies Defendant's imported limitations. '311 Case Dkt. No. 68 at 7–8.

Plaintiff cites further **intrinsic evidence** to support its position: '107 Patent col.2 l.30; '439 Patent File Wrapper June 7, 2016 Amendment at 13 (Defendant's Ex. C, Dkt. No. 64-4 at 14).

**<u>Analysis</u>**

The dispute distills to four issues. First, whether "information indicating which game piece has been provided to which user" necessarily identifies each provided game piece and the user(s) to which the game piece has been provided. It does. Second, whether "game pieces" should be construed as "constituent game pieces." For the reasons provided in the section on "game pieces" above, it should not. Third, whether "determining . . . based on the allocation information . . ." in the claims of the '107 Patent necessarily requires "checking the allocation" information. It does not. Fourth, whether "determining whether all the required game pieces have been provided to the first plurality of users" in the claims of the '439 Patent necessarily requires determining whether "each user of the first [plurality of users] has received a game piece." It does not.

The "allocation information" identifies each provided game piece and the user to which the game piece has been provided. This is the plain meaning of "indicating which game piece has been provided to which user." The Court is not persuaded that the '107 and '439 Patents' description of embodiments rises to the exacting standard to enlarge this plain meaning to encompass simply indicating "game pieces generally provided to users as opposed to individual game pieces provided to individual users" as Plaintiff contends.

The Court rejects: (1) Defendant's proposed rewrite of "based on the allocation information" as "by checking the allocation information" or "the allocation information indicates" and (2) Defendant's proposed requirement that "determining whether all the game pieces have been provided to the first plurality of users" necessitates determining whether each user of the first plurality of users has received a game piece. The Court is not persuaded that the '107 and '439 Patents' description of embodiments rises to the exacting standard to warrant importing such limitations, which are clearly not expressed in the examined and issued claim language.

Accordingly, the Court construes "allocation information . . ." as follows and rejects Defendant's proposed constructions of the "determining . . ." terms and determines that the "determining . . ." terms have their plain and ordinary meanings without the need for further construction:

- "allocation information indicating which game piece has been provided to which user" means "allocation information identifying each provided game piece and the user to which the game piece has been provided."

### B-5. The Parameter-Value Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "parameter value"<br><br>• '439 Patent Claims 1, 6, 7 | plain and ordinary meaning; no construction needed | a value set in advance of a game expressing an attribute for each individual user of the group that affects the progress of an independent task for that user |

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "storing […] a parameter value for each of the plurality of users, wherein the parameter value for a respective user is increased as the respective user makes progress in the group event"<br><br>• '439 Patent Claims 1, 6, 7 | plain and ordinary meaning; no construction needed | storing […] a parameter value for each of the plurality of users, wherein the same parameter value for a respective user is increased as the respective user makes progress in the group event |
| "updating the parameter value for each of the first plurality of users in accordance with the progress of the first group in the group event"<br><br>• '439 Patent Claims 1, 6, 7 | plain and ordinary meaning; no construction needed | updating the same parameter value for each of the first plurality of users in accordance with the progress of the first group in the group event |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The meanings of these Parameter-Value terms are plain without construction. Defendant's proposed constructions improperly require the "parameter value" to be "set in advance of a game." The '107 and '439 Patents, however, describe setting a parameter value during a game, in advance of a battle (citing '107 Patent col.4 ll.56–61, col.5 ll.21–23, col.11 ll.4–39). Defendant also improperly injects "expressing an attribute for each individual user of the group that affects the progress of an independent task for that user," which limitation is without support in the intrinsic record. Finally, changing "the parameter value" to "the same parameter value" is either unnecessary, since "the parameter value" plainly refers back to the previously recited "a parameter value," or confusing, since it is unclear what parameter values are the "same." '311 Case Dkt. No. 62 at 18–20.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent col.4 ll.56–61, col.5 ll.21–29, col.5 ll.43–55, col.11 ll.4–39.

Defendant responds: As described in the '107 and '439 Patents, the parameter value indicates an attribute of the user's character that affects "the progress of an independent task of a user" and that is set in advance of the game (citing, inter alia, '439 Patent col.5 ll.43–57). These characteristics of the "parameter value" are necessary to achieve the stated goal of the invention since the user will need to know the values to "best choose a group to join and aid." And, as described, the parameter values affect independent—solo—game play in contrast to cooperative play with other users (citing '107 Patent col.17 ll.40–46). Finally, Defendant "adds the phrase 'same' because 'the parameter value' requires an antecedent basis." '311 Case Dkt. No. 64 at 24–27.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '439 Patent figs.3, 5, col.2 ll.26–29 col.4 ll.41–43. col.4 ll.59–61, col.5 ll.23–36, col.5 ll.43–57, col.8 ll.12–23, col.10 ll.30–33, col.10 ll.51–64, col.17 ll.40–46, col.18 ll.45–52; '439 Patent File Wrapper June 7, 2016 Amendment at 13 (Defendant's Ex. C, Dkt. No. 64-4 at 14).

Plaintiff replies: The '107 and '439 Patents describe parameter values that are set in advance of an event or task and parameter values that are stored in advance. Thus, it would be improper to limit parameters values to values set in advance of a game. Further, the "independent task" limitation is not even mentioned in the intrinsic record. Finally, the antecedent basis for "the parameter value" is clear in the claims, there is no need to inject a "same" limitation. '311 Case Dkt. No. 68 at 8–9.

Plaintiff cites further **intrinsic evidence** to support its position: '107 Patent col.4 ll.36–38, col.5 ll.21–33.

**<u>Analysis</u>**

There appear to be three issues in dispute. First, whether the "parameter value" is necessarily set in advance of a game. It is not. Second, whether the "parameter value" is restricted to "an independent task." It is not. Third, whether "the parameter value" should be rewritten as "the same parameter value" to provide an antecedent basis. It should not; the antecedent basis is already clear in the claims.

The claims again provide significant guidance regarding the nature of the "parameter value" limitations. For example, Claim 7 of the '439 Patent provides:

> **7**. A non-transitory computer readable recording medium for storing a program that causes a processor of a game control device to execute a process, the game control device providing a game to a plurality of communication terminals respectively used by a plurality of users over a communication network, and having a storage unit, the process comprising the steps of:
>   (a) grouping the plurality of users into one or more groups;
>   (b) storing a correspondence between the plurality of users and the one or more groups in the storage unit;
>   (c) transmitting information over the communication network to initiate a group event in which a first plurality of users forming a first group cooperatively participate in the game;
>   (d) *storing <u>a parameter value</u> for each of the plurality of users, wherein <u>the parameter value</u> for a respective user is increased as the respective user makes progress in the group event;*
>   (e) monitoring progress of the group event and *updating <u>the parameter value</u> for each of the first plurality of users in accordance with the progress of the first group in the group event*;
>   (f) *providing at least one of a plurality of game pieces to each of the first plurality of users in the group event, based on the <u>parameter value</u>* for the corresponding user, wherein the plurality of game pieces are required to obtain a game item;
>   (g) storing allocation information indicating which game piece has been provided to which user, in the storage unit;
>   (h) determining whether all the required game pieces have been provided to the first plurality of users, based on the allocation information; and

> (i) allocating in a memory, the game item to the first group or at least one of the first plurality of users, when it is determined that all the required game pieces have been provided within a predetermined period of time during which the group event is taking place.

'439 Patent col.26 l.54 – col.28 l.17 (emphasis added). It is clear from the claims that "a parameter value" is stored for each of the plurality of users and that "the parameter value" for each of the users is manipulated and used via operation of the claims, including "updating the parameter value . . . in accordance with the progress . . . in the group event."

The Court rejects Defendant's proposed "set in advance of a game" and "expressing an attribute for each individual user of the group that affects the progress of an independent task for that user" limitations. As evinced by Claim 7, the claims themselves set forth that a parameter value is stored for each user and what each user's parameter value does in operation of the claim. Plus, the claims are silent on when the value is set. The Court is not persuaded that the '107 and '439 Patents' description of embodiments or the goals of the invention rise to the exacting standard required to inject Defendant's proposed extraneous limitations.

The Court also rejects Defendant's proposal to rewrite "the parameter value" as "the same parameter value." Defendant's justification for this is nonsensical. The claims clearly provide an antecedent basis for "the parameter value" in the earlier-recited "a parameter value."

Accordingly, the Court rejects Defendant's proposed constructions and determines that these terms have their plain and ordinary meanings without the need for further construction.

### B-6.   "cooperatively participate in the game"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "cooperatively participate in the game" <br><br> • '439 Patent Claims 1, 6, 7 | plain and ordinary meaning; no construction needed <br><br> alternatively, <br> • players working towards a common goal in the game | participate in the game by completing the same task dependent on other users |

### The Parties' Positions

Plaintiff submits: The meaning of the term "cooperatively participate in the game" is plain without construction. Defendant's proposed construction improperly limits the cooperation to the "same task dependent on other users." The '107 and '439 Patents describe groups of users working together to obtain multiple different game pieces, allowing that each user may collect a different game piece by performing different tasks. '311 Case Dkt. No. 62 at 21–22.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent col.1 l.66 – col.2 l.3, col.2 ll.23–55, col.17 l.40 – col.18 l.3, col.23 ll.35–49, col.23 ll.62–64.

Defendant responds: The '107 and '439 Patents distinguish between independent individual tasks, in which a single player performs the task, and cooperative tasks, in which a group of players work together to complete a task. To "cooperatively participate in the game," the users must complete the same task together, dependent on other users. '311 Case Dkt. No. 64 at 27–28.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '439 Patent col.4 ll.1–12, col.17 ll.40–46, col.23 ll.35–49.

Plaintiff replies: While the patents describe a "main cycle" with tasks performed independent of other users and a "sub cycle" in which users "play in cooperation with one another," this does

not restrict the plain meaning of "cooperatively participate in the game" to game play in which users perform the same task dependent on other users. '311 Case Dkt. No. 68 at 9.

**<u>Analysis</u>**

The issue in dispute is whether the requirement that users "cooperatively participate in the game" necessarily requires completing the same task dependent on other users. It does not.

The Court is not persuaded that Defendant's cited descriptions of the embodiments or goal of the invention rise to the exacting standard required to inject the proposed extraneous limitations. Indeed, the '107 and '439 Patents suggest that allowing different users to acquire different game pieces based in the skill level of the users encourages cooperation amongst users of different skill levels. *See* '107 Patent col.2 ll.12–55, col.17 l.47 – col.23 l.7. This suggests that one user may pursue the task of collecting a first piece while another user pursues the task of collecting a second piece, all while working together to collect—as a group—all the pieces necessary to receive a game item.

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

**B-7.    "periodically causing an event to occur for providing one of the plurality of game pieces to a user"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "periodically causing an event to occur for providing one of the plurality of game pieces to a user"<br><br>• '439 Patent Claim 4 | See construction of "game pieces." Otherwise, plain and ordinary meaning; no construction needed. | a game control device periodically performs processing to cause an event to occur for providing one of the plurality of game pieces to a user |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction. Defendant's proposed construction improperly incorporates limitations expressed elsewhere in the claim: "the game control device causes the event to occur; however, this limitation is already captured by the preamble of Claim 1 of the '439 Patent from which Claim 4 depends." '311 Case Dkt. No. 62 at 22.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent col.17 ll.40–46, col.20 ll.62–65.

Defendant responds: The game control device not only periodically causes the event; it also provides the game piece to the user. '311 Case Dkt. No. 64 at 28–29.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '439 Patent fig.16, col.21 ll.16–31; '439 Patent File Wrapper June 7, 2016 Amendment at 9, 13 (Defendant's Ex. C, Dkt. No. 64-4 at 10, 14).

Plaintiff replies: The preamble of Claim 1 (and thus Claim 4) is limiting and thus there is no need to add a "game control device" to each limitation. Further, the claim language at issue requires only that the game control device cause the event "for providing" a game piece, not that the game control device actually provides the game piece. '311 Case Dkt. No. 68 at 10.

**Analysis**

The issue in dispute appears to be whether the game control device necessarily provides the game pieces to a user. It does, but this is elsewhere expressed in the claims.

The meaning of Claim 4 is plain in the context of the surrounding claim language:

> 1. ***A game control method carried out by a game control device*** for providing a game to a plurality of communication terminals respectively used by a plurality of users, the game control device communicating with the plurality of communication terminals over a communication network and having a storage

unit for storing information for each of the plurality of users, ***the method comprising the steps of***:

(a) grouping the plurality of users into one or more groups;

(b) storing a correspondence between the plurality of users and the one or more groups in the storage unit;

(c) transmitting information over the communication net- work to initiate a group event in which a first plurality of users forming a first group cooperatively participate in the game;

(d) storing a parameter value for each of the plurality of users, wherein the parameter value for a respective user is increased as the respective user makes progress in the group event;

(e) monitoring progress of the group event and updating the parameter value for each of the first plurality of users in accordance with the progress of the first group in the group event;

(f) ***providing at least one of a plurality of game pieces to each of the first plurality of users*** *in the group event, based on the parameter value for the corresponding user, wherein the plurality of game pieces are required to obtain a game item*;

(g) storing allocation information indicating which game piece has been provided to which user, in the storage unit;

(h) determining whether all the required game pieces have been provided to the first plurality of users, based on the allocation information; and

(i) allocating in a memory, the game item to the first group or at least one of the first plurality of users, when it is determined that all the required game pieces have been provided within a predetermined period of time during which the group event is taking place.

**3.** The game control method according to claim 1, further comprising the step of

(j) deleting the allocation information from the storage unit when the predetermined period of time has elapsed.

**4.** The game control method according to claim **3,** further comprising the step of

(k) periodically causing an event to occur ***for providing*** *one of the plurality of game pieces to a user*, wherein

in step (f), *one of the plurality of game pieces is provided to one of the first plurality of users in the event*.

'439 Patent col.25 l.37 – col. 26 l.22 (emphasis added). The "game control device" necessarily

carries out the steps of the method of Claim 4 of the '439 Patent, which include the steps of Claims

1 and 3. The language of Claim 4 requires that the game control device causes the event for

providing the game pieces, and that the "providing at least one of a plurality of game pieces to

each of the first plurality of users . . ." of step (f) of Claim 1 involves providing a game piece to a user "in the event." Thus, in context, the game control device provides the game piece in the event caused by the game control device.

Accordingly, the Court rejects Defendant's proposed construction, holds that the preamble of Claim 1 is limiting and applies to Claim 4, and determines the "periodically causing an event to occur for providing one of the plurality of game pieces to a user" has its plain and ordinary meaning without the need for further construction.

### B-8.  "ranking point"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "ranking point"<br><br>• '439 Patent Claim 5 | measurement of success in a group event | point granted alongside a reward to a group for collecting required game pieces which, based on total points collected, can impact the type of game item given to the group, and which is also granted for completing tasks outside the group event |

**The Parties' Positions**

Plaintiff submits: As described in the '107 and '439 Patents, a "ranking point" is granted to the user group "'for each predetermined period of time'" and that it "'is expected that . . . [the] users . . . will positively play the . . . game in order to obtain the ranking point'" (quoting '107 Patent col.23 ll.20–24, col.23 ll.26–28). This is "consistent with a 'measurement of success in the group event,' with rewards given based on this measurement." '311 Case Dkt. No. 62 at 23.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '107 Patent col.23 ll.17–31.

Defendant responds: The patents describe that the ranking point is provided apart from the reward given for collecting all the required game pieces and that the ranking point is used to provide rewards to the group of users. Notably, the patents allow ranking points to be granted for a user's solo play apart from the group event. Plaintiff's proposed construction fails because it does not account for ranking points granted for solo play. '311 Case Dkt. No. 64 at 29–30.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '439 Patent col.23 l.56 – col.24 l.3, col.25 ll.14–20.

Plaintiff replies: Neither the claims nor the description of the embodiments requires the ranking point to "impact[] the type of game item given to the group" or to be "granted for completing tasks outside the group event." '311 Case Dkt. No. 68 at 10.

## <u>Analysis</u>

There are two issues in dispute. First, whether a "ranking point" is necessarily "granted for completing tasks outside the group event." It is not. Second, whether a "ranking point" necessarily "can impact the type of game item given to the group." It does not necessarily have this attribute.

Claim 5 of the '439 Patent provides significant guidance regarding the nature and use of the "ranking point":

> 5. The game control method according to claim 1, further comprising the steps of:
> (l) storing a ***ranking point*** for the first group when it is determined that all the required game pieces have been provided; and
> (m) storing a reward for the first plurality of users in accordance with a total value of ranking points for the first group during a predetermined period of time.

'439 Patent col.26 ll.23–30 (emphasis added). It is clear from the claims that the ranking point is stored on successful provision of all the required games pieces and that a reward is stored in accordance with the total value of ranking points.

The Court reject's Defendant's proposed limitations of "granted for completing tasks outside the group event" and "can impact the type of game item given to the group." With respect to the "granted for completing tasks outside the group event" limitation, the Court agrees that such an embodiment is provided in the '107 and '439 Patents but is not persuaded that such an attribute is inherent to a "ranking point." With respect to "can impact the type of game item given to the group," the Court finds no support for reading such a limitation into the claims. Indeed, the "reward" provided in accordance with ranking points is described as different than the "game item" provided for collecting all the required game pieces. *See, e.g.*, *id.* at col.23 ll.56–62 ("In the case where the target guild collects all of the game pieces, it is also possible to give a ranking point to the target guild besides the reward described above. It is possible to totalize the ranking point given to the target guild . . . and to give various kinds of rewards . . . in accordance with the total value of the ranking point.").

Accordingly, the Court construes "ranking point" as "measurement of success."

## V.    CONCLUSION

The parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 12th day of October, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE